FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

INNOVATION LAW LAB; CENTRAL
AMERICAN RESOURCE CENTER OF
NORTHERN CALIFORNIA; CENTRO
LEGAL DE LA RAZA; UNIVERSITY OF
SAN FRANCISCO SCHOOL OF LAW
IMMIGRATION AND DEPORTATION
DEFENSE CLINIC; AL OTRO LADO;
TAHIRIH JUSTICE CENTER,

        Plaintiffs-Appellees,

    v.

KEVIN K. MCALEENAN, Acting
Secretary of Homeland Security, in his
official capacity; U.S. DEPARTMENT OF
HOMELAND SECURITY; LEE FRANCIS
CISSNA, Director, U.S. Citizenship and
Immigration Services, in his official
capacity; JOHN L. LAFFERTY, Chief of
Asylum Division, U.S. Citizenship and
Immigration Services, in his official
capacity; UNITED STATES CITIZENSHIP
AND IMMIGRATION SERVICES; TODD
C. OWEN, Executive Assistant
Commissioner, Office of Field Operations,
U.S. Customs and Border Protection, in his
official capacity; U.S. CUSTOMS AND
BORDER PROTECTION; RONALD D.
VITIELLO, Acting Director, U.S.
Immigration and Customs Enforcement, in
his official capacity; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT,

No.   19-15716

D.C. No. 3:19-cv-00807-RS

OPINION

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted April 24, 2019
San Francisco, California

Before: O'SCANNLAIN, W. FLETCHER, and WATFORD, Circuit Judges.

PER CURIAM:

In January 2019, the Department of Homeland Security (DHS) issued the Migrant Protection Protocols (MPP), which initiated a new inspection policy along the southern border. Before the MPP, immigration officers would typically process asylum applicants who lack valid entry documentation for expedited removal. If the applicant passed a credible fear screening, DHS would either detain or parole the individual until her asylum claim could be heard before an immigration judge. The MPP now directs the "return" of asylum applicants who arrive from Mexico as a substitute to the traditional options of detention and parole. Under the MPP, these applicants are processed for standard removal proceedings, instead of expedited removal. They are then made to wait in Mexico until an immigration judge resolves their asylum claims. Immigration officers exercise discretion in returning the applicants they inspect, but the MPP is categorically inapplicable to unaccompanied minors, Mexican nationals, applicants

who are processed for expedited removal, and any applicant "who is more likely than not to face persecution or torture in Mexico."

Eleven Central American asylum applicants who were returned to Tijuana, Mexico, and six organizations that provide asylum-related legal services challenged the MPP on several grounds in the district court. After concluding that the MPP lacks a statutory basis and violates the Administrative Procedure Act (APA), the district court enjoined DHS on a nationwide basis "from continuing to implement or expand the [MPP]."

DHS has moved for a stay of the preliminary injunction pending its appeal to this court. Our equitable discretion in ruling on a stay motion is guided by four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks omitted). We begin with a discussion of the first factor, which turns largely on the plaintiffs' likelihood of success on their claim that the MPP lacks statutory authorization.

I

Some background is in order before addressing the merits of the plaintiffs' statutory claim. Congress has established an exhaustive inspection regime for all

non-citizens who seek admission into the United States. *See* 8 U.S.C.

§ 1225(a)(3). Applicants for admission are processed either through expedited

removal proceedings or through regular removal proceedings. Section 1225(b)(1)

outlines the procedures for expedited removal and specifies the class of non-

citizens who are eligible for expedited removal:

> If an immigration officer determines that an alien (other
> than an alien described in subparagraph (F)) who is
> arriving in the United States or is described in clause (iii)
> is inadmissible under section 1182(a)(6)(C) or 1182(a)(7)
> of this title, the officer shall order the alien removed from
> the United States without further hearing or review
> unless the alien indicates either an intention to apply for
> asylum under section 1158 of this title or a fear of
> persecution.

§ 1225(b)(1)(A)(i). Simply put, an applicant is eligible for expedited removal only

if the immigration officer determines that the individual is inadmissible on one of

two grounds: fraud or misrepresentation (§ 1182(a)(6)(C)) or lack of

documentation (§ 1182(a)(7)).

All applicants for admission who are not processed for expedited removal

are placed in regular removal proceedings under § 1225(b)(2)(A). That process

generally entails a hearing before an immigration judge pursuant to § 1229a.

Section 1225(b)(2)(B) provides exceptions to § 1225(b)(2)(A), while

§ 1225(b)(2)(C) permits applicants processed under § 1225(b)(2)(A) to be returned

to the contiguous territory from which they arrived for the duration of their

removal proceedings.  Section 1225(b)(2) provides in full:

> **(A) In general**
>
> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.
>
> **(B) Exception**
>
> Subparagraph (A) shall not apply to an alien—
>
> > **(i)** who is a crewman,
> >
> > **(ii)** to whom paragraph (1) applies, or
> >
> > **(iii)** who is a stowaway.
>
> **(C) Treatment of aliens arriving from contiguous territory**
>
> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

DHS relies on the contiguous-territory provision in subsection (b)(2)(C) as

the statutory basis for the MPP.  That provision authorizes DHS to return "alien[s]

described in subparagraph (A)" to Mexico or Canada.  § 1225(b)(2)(C).  The

phrase "described in" refers to the "salient identifying features" of the individuals

subject to this provision.  *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (emphasis

and internal quotation marks omitted).  Because the plaintiffs in this case are not

"clearly and beyond a doubt entitled to be admitted," they fit the description in § 1225(b)(2)(A) and thus seem to fall within the sweep of § 1225(b)(2)(C).

As the district court interpreted the statute, however, the contiguous-territory provision may not be applied to applicants for admission who could have been placed in expedited removal under § 1225(b)(1), even if they were placed in regular removal proceedings. The crux of this argument is § 1225(b)(2)(B)(ii), which provides that "[s]ubparagraph (A) shall not apply to an alien . . . to whom paragraph (1) applies." So long as the applicant is eligible for expedited removal, the district court reasoned, § 1225(b)(1) "applies" to that individual. On this account, it is immaterial that the plaintiffs were not in fact processed for expedited removal during their inspection at the border.

The primary interpretive question presented by this stay motion is straightforward: Does § 1225(b)(1) "apply" to everyone who is *eligible* for expedited removal, or only to those *actually processed* for expedited removal? The interpretive difficulty arises mainly because the inadmissibility grounds contained in subsections (b)(1) and (b)(2) overlap. A subset of applicants for admission—those inadmissible due to fraud or misrepresentation, § 1182(a)(6)(C), and those who do not possess a valid entry document, § 1182(a)(7)—may be placed in expedited removal. § 1225(b)(1)(A)(i). But as we read the statute, anyone who is "not clearly and beyond a doubt entitled to be admitted" can be

processed under § 1225(b)(2)(A). Section 1225(b)(2)(A) is thus a "catchall" provision in the literal sense, and Congress' creation of expedited removal did not impliedly preclude the use of § 1229a removal proceedings for those who could otherwise have been placed in the more streamlined expedited removal process. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 522–24 (BIA 2011).

Because the eligibility criteria for subsections (b)(1) and (b)(2) overlap, we can tell which subsection "applies" to an applicant only by virtue of the processing decision made during the inspection process. Take first the procedures for designating an applicant for expedited removal. When the immigration officer "determines" that the applicant "is inadmissible" under § 1182(a)(6)(C) or (a)(7), he "shall order the alien removed from the United States without further hearing" unless the applicant requests asylum or expresses a fear of persecution, in which case the officer "shall refer the alien for an interview by an asylum officer under subparagraph (B)." 8 U.S.C. § 1225(b)(1)(A)(i)–(ii). In other words, the officer decides inadmissibility on the spot without sending the matter to an immigration judge. DHS's regulations further explain that a § 1225(b)(1) determination entails either the issuance of a Notice and Order of Expedited Removal or the referral of the applicant for a credible fear screening. 8 C.F.R. § 235.3(b)(2)(i), (4); *see also id.* § 208.30. And to "remove any doubt" on the issue, § 1225(b)(2)(B) clarifies

that applicants processed in this manner are not entitled to a proceeding under § 1229a. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008).

In contrast, § 1225(b)(2) is triggered "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Following this determination, the officer will issue a Notice to Appear, which is the first step in a § 1229a proceeding. 8 C.F.R. § 235.6(a)(1)(i); *see also id.* § 208.2(b). A Notice to Appear can charge inadmissibility on *any* ground, including the two that render an individual eligible for expedited removal. 8 U.S.C. § 1229a(a)(2). The officer then sets a date for a hearing on the issue before an immigration judge. *See Pereira v. Sessions*, 138 S. Ct. 2105, 2111 (2018).

The plaintiffs were not processed under § 1225(b)(1). We are doubtful that subsection (b)(1) "applies" to them merely because subsection (b)(1) *could have been* applied. And we think that Congress' purpose was to make return to a contiguous territory available during the pendency of § 1229a removal proceedings, as opposed to being contingent on any particular inadmissibility ground. Indeed, Congress likely believed that the contiguous-territory provision would be altogether unnecessary if an applicant had already been processed for expedited removal. The plaintiffs are properly subject to the contiguous-territory provision because they were processed in accordance with § 1225(b)(2)(A).

Though the plaintiffs contend otherwise, our approach is consistent with the subsections' headings. Section 1225(b)(1) is titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," and § 1225(b)(2) is labeled "Inspection of other aliens." The plaintiffs interpret § 1225(b) to create two mutually exclusive *pre-inspection* categories of applicants for admission; as explained above, we read the statute to create two mutually exclusive *post-inspection* categories. In our view, those who are not processed for expedited removal under § 1225(b)(1) are the "other aliens" subject to the general rule of § 1225(b)(2).

Our interpretation is also consistent with *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the principal authority on which the plaintiffs rely. There, the Supreme Court explained that "applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Id.* at 837. As the Court noted, "Section 1225(b)(1) applies to aliens *initially determined* to be inadmissible due to fraud, misrepresentation, or lack of valid documentation." *Id.* (emphasis added). "Section 1225(b)(2) is broader," since it "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." *Id.* We think our interpretation more closely matches the Court's understanding of the mechanics of § 1225(b), as it is attentive to the

role of the immigration officer's initial determination under § 1225(b)(1) and to § 1225(b)(2)'s function as a catchall.

For the foregoing reasons, we conclude that DHS is likely to prevail on its contention that § 1225(b)(1) "applies" only to applicants for admission who are processed under its provisions. Under that reading of the statute, § 1225(b)(1) does not apply to an applicant who is processed under § 1225(b)(2)(A), even if that individual is rendered inadmissible by § 1182(a)(6)(C) or (a)(7). As a result, applicants for admission who are placed in regular removal proceedings under § 1225(b)(2)(A) may be returned to the contiguous territory from which they arrived under § 1225(b)(2)(C).

The plaintiffs have advanced only one other claim that could justify a nationwide injunction halting the implementation of the MPP on a wholesale basis: that the MPP should have gone through the APA's notice-and-comment process. DHS is likely to prevail on this claim as well, since "general statements of policy" are exempted from the notice-and-comment requirement. 5 U.S.C. § 553(b)(A). The MPP qualifies as a general statement of policy because immigration officers designate applicants for return on a discretionary case-by-case basis. *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 507 (9th Cir. 2018); *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987).

II

The remaining factors governing issuance of a stay pending appeal weigh in the government's favor. As to the second factor, DHS is likely to suffer irreparable harm absent a stay because the preliminary injunction takes off the table one of the few congressionally authorized measures available to process the approximately 2,000 migrants who are currently arriving at the Nation's southern border on a daily basis. *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1250–51 (9th Cir. 2018). DHS has therefore made a strong showing on both the first and second factors, which are the "most critical." *Nken*, 556 U.S. at 434.

The other two factors support the issuance of a stay as well. The plaintiffs fear substantial injury upon return to Mexico, but the likelihood of harm is reduced somewhat by the Mexican government's commitment to honor its international-law obligations and to grant humanitarian status and work permits to individuals returned under the MPP. We are hesitant to disturb this compromise amid ongoing diplomatic negotiations between the United States and Mexico because, as we have explained, the preliminary injunction (at least in its present form) is unlikely to be sustained on appeal. Finally, the public interest favors the "efficient administration of the immigration laws at the border." *East Bay Sanctuary Covenant*, 909 F.3d at 1255 (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)).

The motion for a stay pending appeal is **GRANTED**.

*Innovation Law Lab v. McAleenan*, No. 19-15716

WATFORD, Circuit Judge, concurring:

I agree that the Department of Homeland Security (DHS) is likely to prevail on the plaintiffs' primary claim, as 8 U.S.C. § 1225(b) appears to authorize DHS's new policy of returning applicants for admission to Mexico while they await the outcome of their removal proceedings. But congressional authorization alone does not ensure that the Migrant Protection Protocols (MPP) are being implemented in a legal manner. As then-Secretary of Homeland Security Kirstjen Nielsen recognized, the MPP must also comply with "applicable domestic and international legal obligations." One of those legal obligations is imposed by Article 33 of the 1951 Convention Relating to the Status of Refugees, which provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Protocol Relating to the Status of Refugees art. I, Jan. 31, 1967, 19 U.S.T. 6223, 6225, 6276 (binding the United States to comply with Article 33). Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment similarly provides:

> No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988).

DHS's stated goal is to ensure that the MPP is implemented in a manner that complies with the *non-refoulement* principles embodied in these treaty provisions. Specifically, Secretary Nielsen's policy guidance on implementation of the MPP declares that "a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion . . . , or would more likely than not be tortured, if so returned pending removal proceedings."

In my view, DHS has adopted procedures so ill-suited to achieving that stated goal as to render them arbitrary and capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). Under DHS's current procedures, immigration officers do not ask applicants being returned to Mexico whether they fear persecution or torture in that country. Immigration officers make inquiries into the risk of *refoulement* only if an applicant affirmatively states that he or she fears being returned to Mexico.

DHS's policy is virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations. It seems fair to assume that at least some asylum seekers subjected to

the MPP will have a legitimate fear of persecution in Mexico. Some belong to protected groups that face persecution both in their home countries and in Mexico, and many will be vulnerable to persecution in Mexico because they are Central American migrants. It seems equally fair to assume that many of these individuals will be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. If both of those assumptions are accurate, DHS will end up violating the United States' treaty obligations by returning some number of asylum seekers to Mexico who should have been allowed to remain in the United States.

There is, of course, a simple way for DHS to help ensure that the United States lives up to its *non-refoulement* obligations: DHS can ask asylum seekers whether they fear persecution or torture in Mexico. I'm at a loss to understand how an agency whose professed goal is to comply with *non-refoulement* principles could rationally decide *not* to ask that question, particularly when immigration officers are already conducting one-on-one interviews with each applicant. This policy of refusing to ask seems particularly irrational when contrasted with how DHS attempts to uphold the United States' *non-refoulement* obligations in expedited removal proceedings. In that context, immigration officers are required to ask applicants whether they fear being removed from the United States and

returned to their home countries. *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to use Form I-867B). Since the same *non-refoulement* principles apply to removal and return alike, DHS must explain why it affirmatively asks about fear of persecution in the removal context but refrains from asking that question when applying the MPP.

DHS has not, thus far, offered any rational explanation for this glaring deficiency in its procedures. (One suspects the agency is not asking an important question during the interview process simply because it would prefer not to hear the answer.) As the record stands now, then, it seems likely that the plaintiffs will succeed in establishing that DHS's procedures for implementing the MPP are arbitrary and capricious, at least in the respect discussed above.

Success on this claim, however, cannot support issuance of the preliminary injunction granted by the district court. We explained recently that the "scope of the remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Here, the plaintiffs' injury can be fully remedied without enjoining the MPP in its entirety, as the district court's preliminary injunction currently does. I expect that appropriate relief for this arbitrary and capricious aspect of the MPP's implementation will involve (at the very least) an injunction directing DHS to ask applicants for admission whether they fear being returned to Mexico. The precise

scope of such relief would need to be fashioned after further proceedings in the district court.  In the meantime, the government is entitled to have the much broader preliminary injunction currently in place stayed pending appeal.

*Innovation Law Lab v. McAleenan*, No. 19-15716

W. FLETCHER, Circuit Judge, concurring only in the result:

I strongly disagree with my colleagues.

The question of law in this case can be stated simply:   The Government relies on 8 U.S.C. § 1225(b)(2)(C) for authority to promulgate its new Migrant Protection Protocols ("MPP").  If § 1225(b)(2)(C) provides such authority, the MPP is valid.  If it does not, the MPP is invalid.  The question is thus whether § 1225(b)(2)(C) provides authority for promulgation of the MPP.  The answer can also be stated simply:  The Government is wrong.  Not just arguably wrong, but clearly and flagrantly wrong.  Section 1225(b)(2)(C) does not provide authority for the MPP.

\* \* \*

I begin with a short summary of established law.  Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), arriving aliens applying for admission into the United States fall into two separate and non-overlapping categories.

First, there are aliens described in 8 U.S.C. § 1225(b)(1).  These are alien applicants for admission who are traveling with fraudulent documents or no documents.  Immigration officers are required by regulation to ask whether these

applicants fear persecution in their home country. If so, they are referred for a "credible fear" interview with an asylum officer. If they are found to have a credible fear of persecution in their home country, and are therefore potentially eligible for asylum, they are placed in a regular removal proceeding under 8 U.S.C. § 1229a. In that proceeding, an Immigration Judge ("IJ") can find them either eligible or ineligible for asylum. Applicants who are referred to regular removal proceedings are entitled to remain in the United States while their eligibility for asylum is determined. Applicants found not to have a credible fear are subject to expedited removal without any formal proceeding.

Second, there are aliens described in 8 U.S.C. § 1225(b)(2). These are all alien applicants for admission not described in § 1225(b)(1). In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Section (b)(2) applicants include aliens who are suspected of being, inter alia, drug addicts, convicted criminals, terrorists, or alien smugglers, and who would therefore be inadmissible. *See* 8 U.S.C. § 1182(a)(1)(A)(iv); (a)(2); (a)(3)(B); (a)(6)(E). Unlike § (b)(1) applicants, § (b)(2) applicants are automatically referred to regular removal proceedings under § 1229a. In those proceedings, an IJ can determine whether the applicants are, in fact, inadmissible on a ground specified in § 1182(a). Also unlike § (b)(1) applicants, § (b)(2) applicants are not entitled to remain in the

2

United States while their admissibility is determined. At the discretion of the Government, they may be "returned" to a "contiguous territory" pending determination of their admissibility. § 1225(b)(2)(C).

This statutory structure has been well understood ever since the passage of IIRIRA in 1996, and until now the Government has consistently acted on the basis of this understanding. The Government today argues for an entirely new understanding of the statute, based on arguments never before made or even suggested.

* * *

It is undisputed that plaintiffs are bona fide asylum applicants under § (b)(1). Although it has long been established that § (b)(1) applicants are entitled to stay in the United States while their eligibility for asylum is determined, the Government is now sending § (b)(1) applicants back to Mexico. The Government refuses to treat them as § (b)(1) applicants. Instead, the Government improperly treats them under the MPP as § (b)(2) applicants who can be "returned" to Mexico under § 1225(b)(2)(C). The Government's arguments in support of the MPP are not only unprecedented. They are based on an unnatural and forced—indeed, impossible—reading of the statutory text.

The relevant text of 8 U.S.C. § 1225 is as follows:

3

**(a) Inspection**

    **(1) Aliens treated as applicants for admission**

        An alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission.

        . . .

**(b) Inspection of applicants for admission**

    **(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

        **(A) Screening**

            **(i) In general**

                If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

            **(ii) Claims for asylum**

                If an immigration officer determines that an alien . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

            . . .

        **(B) Asylum interviews**

            . . .

            **(ii) Referral of certain aliens**

                If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum.

        . . .

    **(2) Inspection of other aliens**

        **(A) In general**

            Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration

officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien —

**(i)** who is a crewman

**(ii)** to whom paragraph (1) applies, or

**(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

The statutory text is unambiguous. There are two categories of "applicants for admission." § 1225(a). First, there are applicants described in § 1225(b)(1). Second, there are applicants described in § 1225(b)(2).

Applicants described in § 1225(b)(1) are those who may be inadmissible under § 1182(a)(6)(C) (applicants traveling with fraudulent documents) or under § 1182(a)(7) (applicants with no valid documents).

Applicants described in § 1225(b)(2) are distinct. In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Put differently, again in the words of the statute, § (b)(2) applicants are applicants "to whom paragraph [b](1)" does not apply. § 1225(b)(2)(B)(ii). That is, § (b)(1) applicants are those who may be inadmissible on either of the two grounds specified in that subsection. Section

5

(b)(2) applicants are all other potentially inadmissible applicants.

Section (b)(1) applicants are more numerous than § (b)(2) applicants, but § (b)(2) is a broader category in the sense that applicants under § (b)(2) are inadmissible on more grounds than applicants under § (b)(1). Applicants inadmissible under § (b)(2) include, for example, aliens with "a communicable disease of public health significance" or who are "drug abuser[s] or addict[s]" (§ 1182(a)(1)(A)(i), (iv)); aliens who have "committed . . . a crime involving moral turpitude" or who have "violat[ed] . . . any law or regulation . . . relating to a controlled substance" (§ 1182(a)(2)(A)(i)); aliens who "seek to enter the United States . . . to violate any law of the United States relating to espionage or sabotage," or who have "engaged in a terrorist activity" (§ 1182(a)(3)(A), (B)); aliens who are "likely . . . to become a public charge" (§ 1182(a)(4)(A)); and aliens who are alien "smugglers" (§ 1182(a)(6)(E)).

Just last year, the Supreme Court distinguished between § (b)(1) and § (b)(2) applicants, stating clearly that they fall into two separate categories:

> [A]pplicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. . . . Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all *applicants for admission not covered by § 1225(b)(1).*

6

*Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018) (emphasis added).

Less than a month ago, the Attorney General of the United States drew the same distinction and briefly described the procedures applicable to the two categories:

> Under section 235 of the Act [8 U.S.C. § 1225], all aliens "arriv[ing] in the United States" or "present in the United States [without having] been admitted" are considered "applicants for admission," who "shall be inspected by immigration officers." INA § 235(a)(1), (3). [8 U.S.C. § 1225(a)(1), (3).] In most cases, those inspections yield one of three outcomes. First, if an alien is "clearly and beyond a doubt entitled to be admitted," he will be permitted to enter, or remain in, the country without further proceedings. *Id.* § 235(b)(2)(A). [8 U.S.C. § 1225(b)(2)(A).] Second, if the alien is not clearly admissible, then, generally, he will be placed in "proceeding[s] under section 240 [8 U.S.C. § 1229a]" of the Act—that is, full removal proceedings. *Id.* Third, if the alien is inadmissible on one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings. *Id.* § 235(b)(1)(A)(i) [8 U.S.C. § 1225(b)(1)(A)(i)]; *see Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011).

*Matter of M-S-*, 27 I. & N. Dec. 509, 510 (BIA April 16, 2019).

The procedures specific to the two categories of applicants are given in their respective subsections.

To some extent, the statutorily prescribed procedures are the same for both categories. If a § (b)(1) applicant passes his or her credible fear interview he or she will be placed in regular removal proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). A § (b)(1) applicant may also be placed directly into regular

7

removal proceedings under § 1229a at the discretion of the Government.  *See*

*Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520 (BIA 2011).  A § (b)(2) applicant

who is "not clearly and beyond a doubt entitled to be admitted" will also be placed

in removal proceedings under § 1229a.  *See* § 1225(b)(2)(A).

Both § (b)(1) and § (b)(2) applicants can thus be placed in regular removal

proceedings under § 1229a, though by different routes.  But the fact that an

applicant is in removal proceedings under § 1229a does not change his or her

underlying category.  A § (b)(1) applicant does not become a § (b)(2) applicant, or

vice versa, by virtue of being placed in a removal proceeding under § 1229a.  A

homely analogy may help make the point.  Dogs and cats can both be placed in the

pound.  But they still retain their separate identities.  Dogs do not become cats, or

vice versa.

However, the statutory procedures for the two categories are not identical.

Some of the procedures are exclusive to one category or the other.  For example, if

a § (b)(1) applicant fails to pass his or her credible fear interview, he or she may be

removed in an expedited proceeding without a removal proceeding under § 1229a.

*See* § 1225(b)(1)(A), (B).  There is no comparable procedure for expedited removal

of a § (b)(2) applicant.  Further, in some circumstances a § (b)(2) applicant may be

"returned" to a "territory contiguous to the United States" pending his or her

removal proceeding under § 1229a. *See* § 1225(b)(2)(C). There is no comparable procedure for a § (b)(1) applicant.

The precise question in this case is whether a § (b)(1) applicant may be "returned" to a contiguous territory under § 1225(b)(2)(C). That is, may a § (b)(1) applicant be subjected to a procedure specified for a § (b)(2) applicant? A plain-meaning reading of § 1225(b)—as well as the Government's longstanding and consistent practice—tell us that the answer is "no."

There is nothing in § 1225(b)(1) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Section (b)(1)(A)(i) tells us with respect to § (b)(1) applicants that an "officer shall order the alien removed . . . without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." Section (b)(1)(A)(ii) tells us that § (b)(1) applicants who indicate an intention to apply for asylum or a fear of persecution "shall" be referred by the immigration officer to an "asylum officer" for an interview. The remainder of § 1225(b)(1) specifies what happens to a § (b)(1) applicant depending on the determination of the asylum officer—either expedited removal or detention pending further consideration. § 1225(b)(1)(B)(ii)-(iii). There is nothing in § 1225(b)(1) stating, or even suggesting, that a § (b)(1) applicant is subject to the "return" procedure of § 1225(b)(2)(C).

9

Nor is there anything in § 1225(b)(2) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Taking § 1225(b)(2) subparagraph by subparagraph, it provides as follows. Subparagraph (A) tells us that unless a § (b)(2) applicant is "clearly and beyond a doubt entitled to be admitted," she or he "shall be detained" for a removal proceeding under § 1229a. § 1225(b)(2)(A). Subparagraph (A) is "[s]ubject to subparagraphs (B) and (C)." *Id.* Subparagraph (B) tells us that subparagraph (A) does not apply to three categories of aliens—"crewm[e]n," § (b)(1) applicants, and "stowaway[s]." § 1225(b)(2)(B). Finally, subparagraph (C) tells us that a § (b)(2) applicant who arrives "on land . . . from a foreign territory contiguous to the United States," instead of being "detained" under subparagraph (A) pending his or her removal proceeding under § 1229a, may be "returned" to that contiguous territory pending that proceeding. § 1225(b)(2)(C). Section (b)(1) applicants are mentioned only once in § 1225(b)(2), in subparagraph (B)(ii). That subparagraph specifies that subparagraph (A)—which tells us what happens to § (b)(2) applicants—does not apply to § (b)(1) applicants.

The "return-to-a-contiguous-territory" provision of § 1225(b)(2)(C) is available only for § (b)(2) applicants. There is no way to read the statute otherwise. Under a plain-meaning reading of the text, as well as the Government's

10

longstanding and consistent practice, the statutory authority upon which the Government now relies simply does not exist.

* * *

In support of its motion to stay the order of the district court pending appeal, the Government makes several arguments. None is persuasive.

The Government first argues that § (b)(1) applicants are included within the category of § (b)(2) applicants. *See* Govt. Brief at 10. Under the Government's argument, there are two categories of applicants, but the categories are overlapping. There are § (b)(1) applicants, who are defined in § (b)(1), and there are § (b)(2) applicants, who are defined as all applicants, including, but not limited to, § (b)(1) applicants.

For this argument, the Government relies on the phrase "an alien seeking admission" in § 1225(b)(2)(A). The Government argues that because § (b)(1) and § (b)(2) applicants are both "aliens seeking admission," subparagraph (A) of § (b)(2) refers to both categories of applicants. Then, because subparagraph (A) is, by its terms, "[s]ubject to subparagraphs (B) and (C)," the Government argues that a § (b)(1) applicant may be "return[ed]" to a "foreign territory contiguous to the United States" under subparagraph (C).

The Government's argument ignores the statutory text, the Supreme Court's

11

opinion in *Jennings* last year, and the opinion of its own Attorney General in *Matter of M-S-* less than a month ago.

The text of § 1225(b) tells us that § (b)(1) and § (b)(2) are separate and non-overlapping categories. Section 1225(b) specifies that § (b)(1) applicants are aliens who are inadmissible either under § 1182(a)(6)(C) or under § 1182(a)(7). Section (b)(2) aliens are "*other* aliens." *See* § 1225(b)(2) (heading) ("Inspection of *other* aliens") (emphasis added). That is, § (b)(2) covers applicants "other" than § (b)(1) applicants. In case a reader has missed the significance of the heading of § (b)(2), the statute makes the point again, this time in the body of § (b)(2). Section (b)(2)(B)(ii) specifically provides that subparagraph (A) of § (b)(2) "shall not apply to an alien . . . to whom paragraph [b](1) applies."

In *Jennings*, the Supreme Court last year told us explicitly that § (b)(1) and § (b)(2) applicants fall into separate and non-overlapping categories. It wrote, "[*A*]*pplicants for admission fall into one of two categories*, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). . . . Section 1225(b)(2) . . . applies to all applicants for admission *not* covered by § 1225(b)(1)." *Jennings*, 138 S. Ct. at 837 (emphasis added). Finally, in *Matter of M-S-*, the Attorney General wrote on April 16 of this year that an applicant is subject to different procedures depending on whether he or she is a § (b)(1) or § (b)(2) applicant. *Matter of M-S-*,

12

27 I. & N. Dec. at 510.

The Government's second argument follows from its first. *See* Govt. Brief at 10–13. For its second argument, the Government relies on subparagraph (B)(ii), which provides: "Subparagraph (A) shall not *apply* to an alien . . . to whom paragraph [b](1) *applies*." § 1225(b)(2)(B)(ii) (emphasis added). The Government argues that subparagraph (B)(ii) allows a government official to perform an act. The act supposedly authorized is to "apply" the expedited removal procedures of § (b)(1) to some of the aliens under § (b)(2), as the Government defines § (b)(2) applicants. (The Government needs to make this argument in order to avoid the consequence of treating all § (b)(1) applicants as § (b)(2) applicants, who are automatically entitled to regular removal proceedings.)

There is a fundamental textual problem with the Government's argument. "Apply" is used twice in the same sentence in § (b)(2)(B)(ii). The first time the word is used, it refers to the application of a statutory section ("Subparagraph (A) shall not apply"). The second time the word is used, it is used in the same manner, again referring to the application of a statutory section ("to whom paragraph [b](1) applies"). When the word is used the first time, it tells us that subparagraph (A) shall not apply. When the word is used the second time, it tells us to whom subparagraph (A) shall not apply: It does not apply to applicants to whom § (b)(1)

13

applies. Neither time does the word "apply" refer to an act performed by a government official.

The Government's third argument is disingenuous. The Government argues that § (b)(1) applicants are more "culpable" than § (b)(2) applicants, and that they therefore deserve to be forced to wait in Mexico while their asylum applications are being adjudicated. The Government argues that returning § (b)(2), but not § (b)(1), applicants to a contiguous territory would have "the perverse effect of privileging aliens who attempt to obtain entry to the United States by fraud . . . over aliens who follow our laws." Govt. Brief at 14. In its Reply Brief, the Government compares § (b)(1) and § (b)(2) applicants, characterizing § (b)(2) applicants as "less-culpable arriving aliens." Govt. Reply Brief at 5. The Government has it exactly backwards.

Section (b)(1) applicants are those who are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7)" of Title 8. Section 1182(a)(6)(C), entitled "Misrepresentation," covers, inter alia, aliens using fraudulent documents. That is, it covers aliens who travel under false documents and who, once they arrive at the border or have entered the country, apply for asylum. Section 1182(a)(7), entitled "Documentation requirements," covers aliens traveling without documents. In other words, § (b)(1) applies to bona fide asylum applicants, who commonly have

14

fraudulent documents or no documents. Indeed, for many applicants, fraudulent documents are their only means of fleeing persecution, even death, in their own countries. The structure of § (b)(1), which contains detailed provisions for processing asylum seekers, demonstrates that Congress recognized that § (b)(1) applicants may have valid asylum claims and should therefore receive the procedures specified in § (b)(1).

The history of § 1225(b)(2)(C) confirms that Congress did not have § (b)(1) applicants in mind. Section 1225(b)(2)(C) was added to IIRIRA late in the drafting process, in the wake of *Matter of Sanchez-Avila*, 21 I. & N. Dec. 444 (BIA 1996). The petitioner in *Sanchez-Avila* was a Mexican national who applied for entry as a "resident alien commuter" but who was charged as inadmissible due to his "involvement with controlled substances." *Id.* at 445. In adding § 1225(b)(2)(C) to what was to become IIRIRA, Congress had in mind § (b)(2) applicants like the petitioner in *Sanchez-Avila*. It did not have in mind bona fide asylum seekers who arrive with fraudulent documents or no documents at all.

Contrary to the Government's argument, § (b)(1) applicants are not more "culpable" than § (b)(2) applicants. Quite the opposite. The § (b)(1) applicants targeted by the MPP are innocent victims fleeing violence, often deadly violence, in Central America. In stark contrast, § (b)(2) applicants include suspected drug

15

addicts, convicted criminals, terrorists, and alien smugglers. *See* § 1182(a)(1)(A)(iv); (a)(2); (a)(3)(B); (a)(6)(E). Section (b)(2) applicants are precisely those applicants who should be "returned" to a "contiguous territory," just as § 1225(b)(2)(C) provides.

* * *

Acting as a motions panel, we are deciding the Government's emergency motion to stay the order of the district court pending appeal. Because it is an emergency motion, plaintiffs and the Government were severely limited in how many words they were allowed. Our panel heard oral argument on an expedited basis, a week after the motion was filed.

I regret that my colleagues on the motions panel have uncritically accepted the Government's arguments. I am hopeful that the regular argument panel that will ultimately hear the appeal, with the benefit of full briefing and regularly scheduled argument, will be able to see the Government's arguments for what they are—baseless arguments in support of an illegal policy that will, if sustained, require bona fide asylum applicants to wait in Mexico for years while their applications are adjudicated.